**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

RARE VALLEY RESOURCES, INC.
and KERRY GLAKELER                                                    PLAINTIFFS

            v.           Civil No. 06-5081

KINETIC TECHNOLOGIES, LLC                                              DEFENDANT

### O R D E R

On the 26th day of October, 2006, **Plaintiffs' Motion For Preliminary Injunction** (document #13) came on for hearing, and from said motion, the response thereto, and the evidence and arguments presented at the hearing, the Court finds and orders as follows:

1. This case concerns a dispute over the marketing of veterinary wound care products. Plaintiffs Rare Valley Resources, Inc. ("Rare Valley") and Kerry Glakeler ("Glakeler") allege four causes of action: breach of contract between Rare Valley and defendant Kinetic Technologies, LLC ("Kinetic"); breach of covenant not to compete; breach of contract between Glakeler and Kinetic; and misappropriation of trade secrets.

Kinetic counterclaims for trademark infringement; false designation of origin; common law unfair competition and misrepresentation of origin; breach of contract by Rare Valley; and breach of contract by Glakeler.

2. Plaintiffs contend that they are entitled to a preliminary injunction which would (a) prevent Kinetic from

selling certain products; (b) prevent Kinetic from soliciting persons on Rare Valley's customer list; and (c) prevent Kinetic from using knowledge of Rare Valley's price lists to gain unfair market advantage.

3. It appears to the Court that there is little dispute between the parties as to the background of the controversy and it may be generally outlined as follows.

Glakeler is the owner and sole employee of Rare Valley, a small company which sells veterinary wound care products. Glakeler's background is in business and marketing.

Kinetic is a small company, owned by a veterinarian and his brother, which also sells veterinary products.

In 2004, the two companies entered into a business relationship. Rare Valley wanted a relationship with Kinetic to help it move into the veterinary market for its products, which had been sold mostly over the counter, and for the benefits of Kinetic's research and development capabilities. Kinetic wanted a relationship with Rare Valley to add a line of wound care products to its inventory, and for the benefits of Glakeler's marketing know-how.

On January 15, 2004, the parties entered into two contracts, a Distribution Agreement between Rare Valley and Kinetic, and a Consultation And Non-Competition Agreement between Glakeler and Kinetic. The parties conducted business together until March 31,

2006, when Kinetic terminated both the Distribution Agreement and the Consultation And Non-Competition Agreement.

Glakeler and Rare Valley filed the instant suit on April 6, 2006.

4. In order to establish their right to preliminary injunctive relief, plaintiffs must satisfy the four factors set out in **Dataphase Systems, Inc. v. CL Systems, Inc.**, **640 F.2d 109 (8th Cir. 1981),** by showing:

- (a) that there a threat of irreparable harm to them;
- (b) that the harm they will suffer if injunctive relief is not granted outweighs any harm to Kinetic if such relief is granted;
- (c) that there is a probability that they will succeed on the merits; and
- (d) that an injunction will serve the public interest.

The Eighth Circuit has cautioned against a "wooden application" of these factors, pointing out that "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." **640 F.2d at 113.** In addition, that court has held that "[i]njunctions are extraordinary legal remedies and are granted sparingly and under strict rules for the protection of all parties," and "will not be granted unless a plaintiff clearly demonstrates that it is entitled to

preliminary restraints in accordance with the criteria set forth by the Court of Appeals." **Corning Savings & Loan Assoc. v. Federal Home Loan Bank Board, 562 F.Supp. 279, 281 (E.D. Ark. 1983)** (internal citations and quotation marks omitted). The burden is "always on the moving party to establish the prerequisites for injunctive relief." *Id.*

The Court has, therefore, analyzed the evidence in light of these principles.

5. Is there a threat of irreparable harm?

The harm urged by plaintiffs is that if Kinetic continues the activities complained of in their motion, plaintiffs' business will be destroyed. They rely on **Corning** for the principle that "[m]onetary loss may constitute irreparable harm only where the movant's very existence is threatened, i.e., where an act threatens an ongoing business with destruction as opposed to mere disruption." *Id.*, **562 F.Supp. at 283**.

The evidence on this issue was not strongly in support of plaintiffs, either as to the sale of competing products, the solicitation of Rare Valley's customers, or use of Rare Valley's price lists. Indeed, as to the latter two categories, there was no evidence that Kinetic was doing these things, although there was evidence that they had the customer and price information and "might" or "could" be using it. Such speculation as to the possibility that something might be occurring is not evidence, and

the Court finds that there is no basis for injunctive relief as to the customer or price lists.

Nor is there much evidence that any product sales by Kinetic might destroy Rare Valley. There was evidence that Kinetic is selling two, and maybe three, wound care products, and realizing in the range of $50,000 to $60,000 per month on them. There was no evidence, however, to show how this impacted Rare Valley's own sales of Product, and thus nothing on which to base a finding that the sales were causing the destruction of Rare Valley, or would present a threat of doing so in the future.

In addition, the Court notes the length of time between termination of the contracts and plaintiffs' request for injunctive relief. The Complaint in this matter was filed on April 6, 2006, but it was not until September 28, 2006, that plaintiffs sought injunctive relief. Glakeler explained this delay by saying that her first priority was to get her company back on its feet after the relationship with Kinetic ended on March 31, 2006. The Court is not persuaded that the time, effort and expense of seeking injunctive relief is such that it would be precluded by even a very intense focus on rebuilding a business, nor would there be any point in such focus if the company was - as plaintiffs allege - being simultaneously destroyed by unfair competition. Thus, both plaintiffs' delay in seeking injunctive relief and Glakeler's explanation for it, cast considerable doubt

on their claim that the conduct of Kinetic poses a real threat of destruction to Glakeler's company.

6. <u>What is the balance of harms</u>?

Plaintiffs argue that the injunction would only require Kinetic to do what it agreed to do in the Distribution Agreement and, therefore, would inflict no harm at all upon Kinetic.

Kinetic takes the position that plaintiffs will suffer no harm if the injunction is not granted - because Kinetic is not selling competing products - but that Kinetic will be harmed if it cannot sell one of the products in question, Ichon, which accounts for about 10% of its sales.

The Court believes, for the reasons given in paragraphs 5 and 7, that the evidence on this issue favors Kinetic.

7. <u>What is the probability that plaintiffs will succeed on the merit of their claims</u>?

Plaintiffs assert two claims that might support injunctive relief: the claim that Kinetic is violating a covenant not to compete contained in the Distribution Agreement, and the claim that Kinetic is misappropriating Rare Valley's trade secrets.

(a) <u>The Covenant Not To Compete Claim</u>:

The Distribution Agreement made Kinetic the distributor for Rare Valley's "Product," which was defined as "all of the 'Aloe Advantage' line" (the components of which were listed by name) and "any improved or updated versions of the aforementioned products,

-6-

including new line additions" introduced by Rare Valley during the term of the Distribution Agreement. The Distribution Agreement also contained a covenant that Kinetic would not, for a period of two years after termination, compete with Rare Valley "in the sale of Product or any other Aloe/Phenol products which are the same or substantially similar to Product."

Plaintiffs set out a list of ten products which they contend Kinetic is selling in violation of these provisions. The evidence, however, showed that only three of those products - Ichon, Silver Med Spray, and Proud Flesh - were or had been sold by Kinetic.

Scott Pierce, a veterinarian and a principal in Kinetic, contrasted the formulations and uses of these three products with plaintiffs' Product line. The active ingredient in Ichon is polysulfated glycosaminoglycan ("PSGAG"), a product derived from bovine trachea, and Ichon can only be sold on the prescription of a licensed veterinarian, whereas plaintiffs' Product line is based on aloe vera and phenol and is sold over the counter. The active ingredients of Proud Flesh are polyethylene glycol, nitrofurazone, dexamethasone, and scarlet oil, and it also requires a prescription. The active ingredient of Silver Med Spray is colloidal silver.

Glakeler testified that PSGAG and aloe vera have the same amino acids, albeit derived from different sources - a factor

which the Court does not consider sufficient to carry plaintiffs' burden of proof. However, the main thrust of her argument was that Kinetic's products are "wound care products," and the Distribution Agreement - as Glakeler interprets it - prohibits Kinetic from competing with Rare Valley in the sale of wound care products.

The Court does not believe Glakeler's interpretation of the agreement is correct. The Distribution Agreement deals with the sale of "Product or any other Aloe/Phenol products which are the same or substantially similar to Product." While Ichon, Silver Med Spray, and Proud Flesh are all wound care products, they are not "Aloe/Phenol products," and they are not "the same or substantially similar to Product." "Wound care products" is a much broader category than what is delineated by the Distribution Agreement. The Court finds nothing in the Distribution Agreement which would prevent Kinetic from selling any and all wound care products - without regard to formulation or application. Thus, the Court is not persuaded that sales of Ichon, Silver Med Spray or Proud Flesh are in violation of the Distribution Agreement.

(b) <u>The Misappropriation of Trade Secrets Claim</u>:

The Court perceives no evidence that Kinetic is misappropriating Rare Valley's trade secrets. As noted in paragraph 6, there is evidence that Kinetic has access to Rare Valley's customer and price lists, but there is no evidence that

it is using those things to compete with Rare Valley.

There is also evidence that Kinetic has access to the formulas for Rare Valley's products, but, as explained below, the allegedly competing products are formulated with completely different substances and, thus, there is no evidence that Kinetic is benefitting from its knowledge of Rare Valley's formulas.

Accordingly, based upon the evidence shown, the Court is not persuaded there is a likelihood that plaintiffs will succeed on either of these claims.

8. <u>What is the public's interest</u>?

Plaintiffs argue that the public interest is served by the enforcement of contracts, while Kinetic argues that the law disfavors covenants not to compete. The Court does not find that this factor weighs particularly in favor of either party.

9. When the Court looks at the foregoing as required by **Dataphase**, it concludes that the balance of equities does not so favor plaintiffs that justice requires enjoining Kinetic from any conduct shown to be occurring. Plaintiffs' Motion For Preliminary Injunction will, therefore, be denied.

**IT IS THEREFORE ORDERED** that **Plaintiffs' Motion For Preliminary Injunction** (document #13) is **denied**.

**IT IS SO ORDERED**, this 31st day of October, 2006.

                                                     /s/ Jimm Larry Hendren
                                                  **JIMM LARRY HENDREN**
                                                  **UNITED STATES DISTRICT JUDGE**